No. 20-2739

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

SUSAN GRASHOFF,

*Plaintiff-Appellant*,

v.

FREDERICK D. PAYNE, in his Official Capacity as
Commissioner of the Indiana Department of Workforce Development,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Indiana, Case No. 1:19-cv-00276
The Honorable Holly A. Brady, District Judge

## BRIEF FOR *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, ACLU OF ILLINOIS, ACLU OF INDIANA, ACLU OF WISCONSIN, FINES AND FEES JUSTICE CENTER, NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE, R STREET INSTITUTE, AND SHRIVER CENTER ON POVERTY LAW IN SUPPORT OF PLAINTIFF-APPELLLANT

Lisa Foster
FINES AND FEES JUSTICE CENTER
185 West Broadway
Suite C-538
New York, NY 10013
(212) 431-2100

Jeremy Rosen
SHRIVER CENTER ON POVERTY
  LAW
67 E. Madison Street, #2000
Chicago, IL 60603
(312) 854-3381

Linda S. Morris
  *Counsel of Record*
Claudia Wilner
NATIONAL CENTER FOR LAW
  AND ECONOMIC JUSTICE
275 Seventh Avenue, #1506
New York, NY 10001
(212) 633-6967
morris@nclej.org

Nusrat J. Choudhury
ROGER BALDWIN FOUNDATION
  OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
(312) 201-9740

R. Orion Danjuma
Amreeta S. Mathai
Olga Akselrod
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

**Counsel for *Amici Curiae***

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

Economic Justice, Shriver Center on Poverty Law

(3)  If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A. None of the amici have parent corporations.

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A. None of the amici issue stock.

(4)  Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

    N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Linda Morris      Date: 11/24/2020

Attorney's Printed Name: Linda Morris

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ✓ No ☐

Address: National Center for Law and Economic Justice, 275 Seventh Ave, #1506

New York, NY 10001

Phone Number: (212) 633-6967    Fax Number:

E Mail Address: morris@nclej.org

rev. 12/19 AK

i

Save As     Clear Form

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

Economic Justice, Shriver Center on Poverty Law

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A. None of the amici have parent corporations.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A. None of the amici issue stock.

(4) Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Claudia Wilner          Date: 11/24/2020

Attorney's Printed Name: Claudia Wilner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: National Center for Law and Economic Justice, 275 Seventh Ave, #1506

New York, NY 10001

Phone Number: (212) 633-6967          Fax Number:

E Mail Address: wilner@nclej.org

rev. 12/19 AK

ii

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center,

National Center for Law and Economic Justice, and Shriver Center on Poverty Law

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

N/A. None of the amici have parent corporations.

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A. None of the amici issue stock.

(4)  Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Nusrat Choudhury    Date: 11/24/2020

Attorney's Printed Name: Nusrat Choudhury

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address: Roger Baldwin Foundation of ACLU, Inc., 150 N. Michigan Ave, Suite 600

Chicago, IL 60601

Phone Number: (312) 201-9740 x.331    Fax Number: 312-288-5225

E Mail Address: nchoudhury@aclu-il.org

rev. 12/19 AK

iii

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

Economic Justice, Shriver Center on Poverty Law

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A. None of the amici have parent corporations.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A. None of the amici issue stock.

(4) Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ R. Orion Danjuma                    Date: 11/24/2020

Attorney's Printed Name: R. Orion Danjuma

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: American Civil Liberties Union, 125 Broad Street - 18th Floor

New York, NY 10004

Phone Number: 212-284-7332                    Fax Number:

E Mail Address: odanjuma@aclu.org

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

    National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

    Economic Justice, Shriver Center on Poverty Law

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A. None of the amici have parent corporations.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A. None of the amici issue stock.

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

---

Attorney's Signature: /s/ Olga Akselrod    Date: 11/25/2020

Attorney's Printed Name: Olga Akselrod

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address: American Civil Liberties Union, 125 Broad Street - 18th Floor

    New York, NY 10004

Phone Number: 212-549-2500    Fax Number:

E Mail Address: oakselrod@aclu.org

rev. 12/19 AK

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

Economic Justice, Shriver Center on Poverty Law

(3)  If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A. None of the amici have parent corporations.

ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A. None of the amici issue stock.

(4)  Provide information required by FRAP 26.1(b)  Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: *Amreeta S. Mathai*    Date: 11/24/20

Attorney's Printed Name: Amreeta S. Mathai

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: American Civil Liberties Union, 125 Broad Street - 18th Floor

New York, NY 10004

Phone Number: 212-549-2500                    Fax Number:

E Mail Address: amathai@aclu.org

rev. 12/19 AK

[ Save As ]    [ Clear Form ]

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

    National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

    Economic Justice, Shriver Center on Poverty Law

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A. None of the amici have parent corporations.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A. None of the amici issue stock.

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

---

Attorney's Signature: /s/ Lisa Foster        Date: 11/24/2020

Attorney's Printed Name: Lisa Foster

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐  No ☑

Address: Fines and Fees Justice Center, 185 West Broadway, C-538

    New York, NY 10013

Phone Number: (212) 431-2100        Fax Number:

E Mail Address: LFoster@finesandfeesjusticecenter.org

rev. 12/19 AK

Save As        Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-2739

Short Caption: Susan Grashoff v. Frederick D. Payne

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   American Civil Liberties Union, ACLU of Illinois, ACLU of Indiana, ACLU of Wisconsin, Fines and Fees Justice Center

   National Center for Law and Economic Justice, R Street Institute, Shriver Center on Poverty Law

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   ACLU of Illinois, American Civil Liberties Union, Fines and Fees Justice Center, National Center for Law and

   Economic Justice, Shriver Center on Poverty Law

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A. None of the amici have parent corporations.

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A. None of the amici issue stock.

(4)   Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Jeremy Rosen           Date: 11/24/20

Attorney's Printed Name: Jeremy Rosen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: Shriver Center on Poverty Law, 67 E Madison Street, #2000

   Chicago, IL 60503

Phone Number: (312) 854-3381           Fax Number:

E Mail Address: jeremyrosen@povertylaw.org

rev. 12/19 AK

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ..........................................i-viii

TABLE OF CONTENTS.................................................................................... ix

TABLE OF AUTHORITIES .................................................................... x-xiv

STATEMENTS OF INTEREST................................................................... 1-2

SUMMARY OF ARGUMENT ...................................................................3

ARGUMENT ...............................................................................................6

    I.    This Court Must Consider an Individual's Financial Circumstances When Conducting Its Excessive Fines Clause Analysis ...................................................6

        a.    The Origins and Purpose of the Excessive Fines Clause Confirm That It Prohibits Sanctions That Are Impoverishing in Light of an Individual's Financial Means .......................................................................7

        b.    This Court Should Join the Multitude of Courts That Consider Individual Financial Circumstances in the Excessive Fines Analysis .........................9

    II.    Attention to an Individual's Limited Financial Means is Necessary to Prevent Abuses of Power and Protect Individual Rights. ...................................................12

    III.    Economic Sanctions Are More Likely to be Impoverishing—and Therefore Excessive—When Imposed on People with Limited Financial Means ................15

        a.    People with Limited Means Are More Likely to Suffer the Loss of Livelihood and Other Consequences Due to Economic Sanctions............16

        b.    Economic Sanctions Perpetuate and Reproduce Conditions of Poverty for Marginalized Communities, Including People of Color .....................20

CONCLUSION....................................................................................................22

CERTIFICATE OF COMPLIANCE ............................................................23

CERTIFICATE OF SERVICE ......................................................................24

# TABLE OF AUTHORITIES

## Cases

*Browning-Ferris Indus. of Vt. v. Kelco Disposal*,
  492 U.S. 257 (1989)....................................................................6, 15

*Colo. Dep't of Lab. & Emp. v. Dami Hosp., LLC*,
  442 P.3d 94 (Colo. 2019)..................................................................10

*Harmelin v. Michigan*,
  501 U.S. 957 (1991)............................................................................6

*Nez Perce Cnty. Prosecuting Att'y v. Reese*,
  136 P.3d 364 (Idaho Ct. App. 2006)..................................................10

*Rivera v. City of Chicago*,
  469 F.3d 631 (7th Cir. 2006) ............................................................11

*Ryan v. CFTC*,
  125 F.3d 1062 (7th Cir. 1997) ............................................................1

*State v. Goodenow*,
  282 P.3d 8 (Or. Ct. App. 2012)..........................................................10

*State v. Timbs*,
  134 N.E.3d 12 (Ind. 2019) ........................................................ 9-10, 20

*State v. Yang*,
  452 P.3d 897 (Mont. 2019)................................................................10

*Timbs v. Indiana*,
  139 S. Ct. 682 (2019)................................................................ *passim*

*United States v. 6380 Little Canyon Rd.*,
  59 F.3d 974 (9th Cir. 1995) ..............................................................11

*United States v. Bajakajian*,
  524 U.S. 321 (1998)........................................................ 3, 5, 6, 8-9, 11

*United States v. Fogg*,
  666 F.3d 13 (1st Cir. 2011)................................................................11

*United States v. Levesque*,
  546 F.3d 78 (1st Cir. 2008)................................................................11

*United States v. Murphy*,
    469 F.3d 1130 (7th Cir. 2006) .................................................................. 11-12

*United States v. Viloski*,
    814 F.3d 104 (2d Cir. 2016).........................................................................11

**Rules**

Fed. R. Civ. P. 54(d)(1)................................................................................................11

**Statutes and Codes**

1787 N.Y. Laws. 344–45 ...............................................................................................8

Ind. Code Ann. § 22-4-13-1.1 ........................................................................................4

Ind. Const. art. I, § 16 ...................................................................................................8

U.S. Const. amend. VIII................................................................................... *passim*

**Other Authorities**

Alex Bender et al., *Not Just a Ferguson Problem: How Traffic Courts Drive Inequality in California* 21 (2016), https://lccrsf.org/wp-content/uploads/Not-Just-a-Ferguson-Problem-How-Traffic-Courts-Drive-Inequality-in-California-4.8.15.pdf............................................................19

Alexis Harris et al., *Monetary Sanctions in the Criminal Justice System* 4 (Apr. 2017), http://www.monetarysanctions.org/wp-content/uploads/2017/04/Monetary-Sanctions-Legal-Review-Final.pdf ...................................................................................................18

Bd. of Governors of the Fed. Rsrv. Sys., *Report on the Economic Well-Being of Households in 2018* (May 2019), https://www.federalreserve.gov/publications/2019-economic-well-being-of-us-households-in-2018-dealing-with-unexpected-expenses.htm...................................................16

Ben Szalinski, *Chicago's Traffic Cameras to Ticket Drivers Going 6 MPH Over Speed Limit*, Ill. Policy (Oct. 29, 2020), https://www.illinoispolicy.org/chicagos-traffic-cameras-to-ticket-drivers-going-6-mph-over-speed-limit/................................................................................12

Beth A. Colgan, *Addressing Modern Debtors' Prisons with Graduated Economic Sanctions that Depend on Ability to Pay*, The Hamilton Project 11 (2019), https://www.hamiltonproject.org/assets/files/Colgan_PP_201903014.pdf ...........................................................11

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014)....................8

Chi. Appleseed & Chi. Council of Laws., *Court Costs, Fines, and Fees Are Bad Policy* (July 23, 2020), http://chicagocouncil.org/court-costs-fines-and-fees-are-bad-policy/.........................18, 20

Crim. Just. Pol'y Program, *Confronting Criminal Justice Debt* 6 (2016),
https://www.nclc.org/images/pdf/criminal-justice/confronting-criminal-justice-debt-3.pdf..........4

Dan Kopf, *The Overlooked Reason Why Some Cities Have Strained Relationships With Cops*,
Bus. Insider (July 11, 2016), https://www.businessinsider.com/reason-for-strained-relationship-
with-police-2016-7.......................................................................................................................20

Dan Kopf & Justin Rohrlich, *No US City Fines People Like Washington Fines People*, Quartz
(Jan. 29, 2020), https://qz.com/1789851/no-us-city-fines-people-like-washington-dc/ ...............12

Dana Kozlov, *18,165 People in Illinois Are Stuck Waiting Out Penalty Weeks Before Getting
Unemployment Checks*, CBS Chi. (Apr. 20, 2020), https://chicago.cbslocal.com/2020/04/
20/18165-people-in-illinois-are-stuck-waiting-out-penalty-weeks-before-getting-unemployment-
benefits/.................................................................................................................................... 19-20

Dick M. Carpenter II et al., *The Price of Taxation by Citation*, Inst. for Just. 5 (Oct. 5, 2019),
https://ij.org/wp-content/uploads/2019/10/Taxation-by-Citation-FINAL-USE.pdf.....................13

Edgar Mendez, *Blacks Slammed by Municipal Court Fines*, Urban Milwaukee (Nov. 4, 2016),
https://urbanmilwaukee.com/2016/11/04/blacks-slammed-by-municipal-court-fines/ ................20

Elliott Ramos, *Chicago Seized and Sold Nearly 50,000 Cars Over Tickets Since 2011, Sticking
Owners With Debt*, WBEZ (Jan. 7, 2019), https://www.wbez.org/shows/wbez-news/chicago-
seizes-and-sells-cars-over-tickets-sticking-drivers-with-debt/1d73d0c1-0ed2-4939-a5b2-
1431c4cbf1dd ................................................................................................................................18

Elliott Ramos, *Chicago's Towing Program is Broken*, WBEZ (Apr. 1, 2019), http://interactive.
wbez.org/brokentowing/ ................................................................................................................15

Fran Spielman, *Lightfoot Defends Methodical Approach to Ending City's 'Addiction' to Fines
and Fees*, Chi. Sun-Times (July 23, 2019), https://chicago.suntimes.com/city-hall/2019/7/23/
20707553/fines-fees-boot-red-light-cameras-city-budget-revenue-lightfoot ...............................14

Hum. Rts. Watch, *Profiting from Probation: America's "Offender-Funded" Probation Industry*
34 (2014), https://www.hrw.org/sites/default/files/reports/us0214_ForUpload_0.pdf.................17

Joe Neel, *Financial Pain From Coronavirus Pandemic 'Much, Much Worse' Than Expected*,
NPR (Sept. 9, 2020), https://www.npr.org/sections/health-shots/2020/09/09/909669760/npr-poll-
financial-pain-from-coronavirus-pandemic-much-much-worse-than-expected ...........................16

Joseph Shapiro, *How Driver's License Suspensions Unfairly Target the Poor*, NPR (Jan. 5,
2015), https://www.npr.org/2015/01/05/372691918/how-drivers-license-suspensions-unfairly-
target-the-poor..............................................................................................................................19

Joseph Shapiro, *Supreme Court Ruling Not Enough to Prevent Debtors Prisons*, NPR (May 21, 2014), https://www.npr.org/2014/05/21/313118629/supreme-court-ruling-not-enough-to-prevent-debtors-prisons ................................................................................................................12

Karin D. Martin et al., *Shackled to Debt: Criminal Justice Financial Obligations and the Barriers to Re-Entry They Create* (Jan. 2017), https://www.hks.harvard.edu/sites/default/files/centers/wiener/programs/pcj/files/shackled_to_debt.pdf.......................................................18

Laura Nolan, *The Debt Spiral: How Chicago's Vehicle Ticketing Practices Unfairly Burden Low-Income and Minority Communities*, Woodstock Inst. 1 (June 2018), https://woodstockinst.org/wp-content/uploads/2018/06/The-Debt-Spiral-How-Chicagos-Vehicle-Ticketing-Practices-Unfairly-Burden-Low-Income-and-Minority-Communities-June-2018.pdf ................................14

Mario Salas & Angela Ciolfi, *Driven By Dollars: A State-by-State Analysis of Driver's License Suspension Laws for Failure to Pay Court Debt* (2017), https://www.justice4all.org/wp-content/uploads/2017/09/Driven-by-Dollars.pdf .........................................................................19

Melissa Sanchez & Sandhya Kambhampati, *How Chicago Ticket Debt Sends Black Motorists Into Bankruptcy*, ProPublica Ill. (Feb. 27, 2018), https://features.propublica.org/driven-into-debt/chicago-ticket-debt-bankruptcy/ ...........................................................................................20

Mike Maciag, *Addicted to Fines*, Governing (Sept. 2019), https://www.governing.com/topics/finance/gov-addicted-to-fines.html .......................................................................................14

Nicholas M. McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause*, 40 Hastings Const. L.Q. 833 (2013) ...................................................................7, 9

Rakesh Kochhar & Richard Fry, *Wealth Inequality Has Widened Along Racial, Ethnic Lines Since End of Great Recession*, Pew Research Ctr. (Dec. 12, 2014), https://www.pewresearch.org/fact-tank/2014/12/12/racial-wealth-gaps-great-recession/.........................................................21

Sarah Stillman, *Get Out of Jail, Inc.*, New Yorker (June 23, 2014), https://www.newyorker.com/magazine/2014/06/23/get-out-of-jail-inc ..................................................................16-17

Shant Shahrigian, *NYC Parking Tickets to Increase as Part of de Blasio Plan to 'Defund' NYPD*, N.Y. Daily News (June 30, 2020), https://www.nydailynews.com/news/politics/ny-parking-tickets-defund-nypd-bill-de-blasio-corey-johnson-20200630-oitbahdqknauhk3jmaltzaxb4q-story.html ...........................................................................................................................13

Steven G. Calabresi et al., *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451 (2012).........8

Tyler Olson*, 'Predatory' DC Government Issues Record $1 Billion in Fines to Drivers*, Fox News (Feb. 21, 2020), https://www.foxnews.com/politics/aaa-calls-dc-parking-and-traffic-enforcement-predatory-as-city-issues-record-1-billion-in-tickets .................................................12

U.S. Comm'n on Civil Rights, *Targeted Fines and Fees Against Communities of Color* 3 (Sept. 2017), https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2017.pdf ....................21

U.S. Dep't of Just., Civil Rights Div., *Investigation of the Ferguson Police Department* 9 (2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ ferguson_police_department_report.pdf ................................................................................ 13-14

4 William Blackstone, *Commentaries on the Laws of England* (1769)..........................................7

# STATEMENTS OF INTEREST[1]

*Amici* are non-profit organizations with "unique information or perspective" on, and extensive litigation experience with, cases challenging excessive economic sanctions under the Eighth Amendment. *See Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997).

The **American Civil Liberties Union** ("ACLU") is a nationwide, non-profit, non-partisan organization of more than 1.6 million members dedicated to defending the principles of liberty and equality embodied in the U.S. Constitution and our nation's civil rights laws. Founded more than 90 years ago, the ACLU has participated in numerous cases involving the scope and application of constitutional rights, both as direct counsel and as amicus curiae. Through its Racial Justice Program, the ACLU engages in nationwide litigation and advocacy to enforce and protect the constitutional rights of impoverished people against unlawful fine, fee, and forfeiture practices.

The **ACLU of Illinois** ("ACLU-IL") is a state affiliate of the ACLU, with over 75,000 members across Illinois. The ACLU-IL is dedicated to the defense of the principles embodied in the U.S. Constitution, Illinois Constitution, and civil rights laws. Through litigation, advocacy, and public education, the ACLU-IL protects the constitutional rights of low-income people against unlawful fine, fee, and forfeiture practices.

The **ACLU of Indiana** ("ACLU-IN") pursues legal claims against governmental entities in many substantive areas, including violations of individuals' Eighth Amendment rights. It is acutely aware of the need to protect the constitutional rights of all citizens, particularly those of low income.

---

[1] No party or party's counsel has authored this brief in whole or in part. No party, party's counsel, or other person has contributed money intended to fund preparing or submitting this brief. Plaintiff-Appellant and Defendant-Appellee both consent to this brief's filing.

The **ACLU of Wisconsin** ("ACLU-WI") is one of the ACLU's affiliates, with 13,500 members and supporters statewide and is dedicated to defending civil liberties and civil rights. The ACLU-WI is committed to advancing constitutional protections against the criminalization of poverty through advocacy, public education, and representation.

The **Fines and Fees Justice Center** ("FFJC") is a national center for advocacy, information, and collaboration on effective solutions to the unjust and harmful imposition and enforcement of fines and fees in state and local courts. FFJC seeks to create a justice system that treats individuals fairly, ensures public safety, and is funded equitably.

The **National Center for Law and Economic Justice** ("NCLEJ") advances economic justice for low-income communities across the country through impact litigation, policy advocacy, and support of grassroots organizing. NCLEJ has worked extensively on issues related to unfair and disproportionate debt collection.

The **R Street Institute** ("R Street") is a non-profit, non-partisan, public-policy research organization. R Street's mission is to engage in policy research and educational outreach that promotes free markets, as well as limited yet effective government, including properly calibrated legal and regulatory frameworks that support economic growth and individual liberty. R Street's Criminal Justice and Civil Liberties program, headed by Arthur Rizer, produces research and commentary on public policy related to all stages of the justice system.

The **Shriver Center on Poverty Law** ("Shriver Center") is a Chicago-based non-profit legal and policy advocacy organization that works with low-income individuals to advance their basic needs. The Shriver Center has deep expertise in fighting harmful laws and policies that impose excessive fines and fees on the lowest-income people.

## SUMMARY OF ARGUMENT

Over the past several decades, there has been an extraordinary increase in fines, fees, and forfeitures across the country—including in Indiana, Illinois, and Wisconsin. The rise in economic sanctions is largely fueled by governments' efforts to generate revenue without imposing taxes. For those who cannot afford to pay, these sanctions often lead to severe consequences, including driver's license suspensions, difficulty obtaining credit and housing, and prolonged entanglement in the criminal legal system. As a result, fines, fees, and forfeitures often create and exacerbate vicious cycles of debt, unemployment, and poverty, jeopardizing the ability of impacted individuals to provide for themselves and disproportionately impacting low-income people and communities of color.

The Excessive Fines Clause ("EFC") of the Eighth Amendment provides an essential safeguard against severe economic sanctions imposed by states. The EFC "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (citation omitted). Though not every practice described would rise to the level of a constitutional violation, the EFC "has been a constant shield throughout Anglo-American history," protecting against government abuses of fines "to raise revenue, harass their political foes, and indefinitely detain those unable to pay." *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019) (citations omitted).

In *United States v. Bajakajian*, the Supreme Court held that an EFC analysis requires evaluating "the proportionality" of an economic sanction in relation to the gravity of an alleged offense. 524 U.S. at 336. Building on that ruling, the Supreme Court recently issued a landmark decision in *Timbs v. Indiana*, emphasizing the EFC's deep historical roots and holding unanimously that it is incorporated against the states. 139 S. Ct. at 688–89. Those historical roots

demonstrate the importance of proportionality in evaluating the excessiveness of a fine[2] with respect to both the offense *and* the economic circumstances of the individual upon whom it is imposed.

This appeal raises three issues related to Ind. Code Ann. § 22-4-13-1.1 ("Section 22-4-13-1.1"), an Indiana statute that imposes economic sanctions on those who fail to report income when applying for unemployment benefits: (1) whether the forfeiture provision in Section 22-4-13-1.1(a), on its face, imposes constitutionally excessive sanctions; (2) whether the penalty provision in Section 22-4-13-1.1(b), on its face, imposes constitutionally excessive sanctions; and (3) whether Section 22-4-13-1.1 was applied to impose an constitutionally excessive sanction of $8,361.25 on Plaintiff-Appellant Susan Grashoff.[3] But the district court's EFC analysis focused only on whether an economic sanction is proportional to the offense without evaluating its proportionality to the financial circumstances of the individual being punished. The district court did not examine the historical antecedents of the EFC and mistakenly concluded that no precedent indicated that an individual's financial circumstances could be considered. This was error.

The EFC's historical origins and purpose confirm that whether an economic sanction is excessive depends on an individual's financial circumstances. An $8,361.25 sanction affects

---

[2] The EFC applies to government-issued economic sanctions, including (1) fines, which constitute punishment for civil or criminal offenses; (2) fees, assessments, and surcharges, which raise revenue or recoup costs associated with prosecution, incarceration, or supervision; and (3) forfeitures of private property seized with or without formal charges against the owner. Crim. Just. Pol'y Program, *Confronting Criminal Justice Debt* 6 (2016), https://www.nclc.org/ images/pdf/criminal-justice/confronting-criminal-justice-debt-3.pdf.

[3] The total economic sanction imposed on Grashoff was $11,190, including an $8,952 forfeiture of benefits and $2,238 civil penalty. Pl.-Appellant's Br. 1–2, 10. A portion of the forfeiture— $2,828.75—was remedial and not subject to the EFC because Grashoff was overpaid that amount due to failure to report part-time income. *Id.* The remaining $6,123.25 of the forfeiture and civil penalty were punitive, with a total sanction of $8,361.25 subject to the EFC. *Id.* at 2–3.

4

someone who is indigent, has debts, and cannot afford to pay for food and shelter differently than it does a wealthier person. The foundational historical sources on which the Supreme Court relies in *Bajakajian* and *Timbs* leave little doubt that an individual's limited means are an inherent component of the EFC's "proportionality" analysis. Prior to *Timbs*, sister circuits had already held that it is proper to consider proportionality in relation to the harshness of the sanction for the individual punished. Following *Timbs*, other courts have updated their EFC tests to conform to its analysis of historical authorities.

This Court should do the same. *Amici* provide concrete data about the growth in exorbitant fines, fees, and forfeitures across the country and how such sanctions impact the real, lived experiences of poor and low-income people. An EFC jurisprudence that fails to account for the direct and collateral consequences of economic sanctions on poor and low-income people conflicts with the EFC's original meaning and purpose. This brief also identifies how federal courts already consider individual financial circumstances—including income, assets, employment status, housing situation, debts, family responsibilities, and ability to meet basic needs—demonstrating they are capable of incorporating this analysis seamlessly. This Court, therefore, should confirm that the EFC's "proportionality" analysis requires taking into account the hardship a fine would impose based on an individual's financial circumstances.

# ARGUMENT

## I.   This Court Must Consider an Individual's Financial Circumstances When Conducting Its Excessive Fines Clause Analysis.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Last year, in *Timbs*, the Supreme Court determined that the EFC is applicable to states because it is "both fundamental to our scheme of ordered liberty and deeply rooted in this Nation's history and tradition." 139 S. Ct. at 689. The Supreme Court has further noted that "[t]here is good reason to be concerned that fines, uniquely of all punishments," will be imposed improperly because, unlike imprisonment, which often costs the government money, "fines are a source of revenue" and so "it makes sense to scrutinize governmental action more closely when the State stands to benefit." *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) (opinion of Scalia, J.).

In *Bajakajian*, the Supreme Court held that the EFC analysis requires courts to evaluate the "proportionality" of the economic sanction to the gravity of the offense. 524 U.S. at 334. *Bajakajian*, however, expressly left open the question of whether a person's "wealth or income [is] relevant" to the excessiveness analysis. *See id.* at 340 n.15. In determining the EFC's scope, courts "look to the origins of the Clause and the purpose which directed its framers." *Browning-Ferris Indus. of Vt. v. Kelco Disposal*, 492 U.S. 257, 264 n.4 (1989). The Supreme Court has turned to seminal historical sources extending back to the Magna Carta and English Bill of Rights, which share a common theme: Any economic sanction must "be proportioned to the wrong and not be so large as to deprive [an individual] of his livelihood." *Timbs*, 139 S. Ct. at 688. These historical sources consistently emphasize that preserving an individual's livelihood has always been on equal footing with ensuring that a fine be proportional to the wrong. They are two sides of the same coin.

Consistent with these historical sources, a reviewing court properly considers not only whether a sanction is facially excessive in relation to an offense, but also whether the sanction is excessive as applied to an individual because of their financial circumstances.

a.     The Origins and Purpose of the Excessive Fines Clause Confirm That It Prohibits Sanctions That Are Impoverishing in Light of an Individual's Financial Means.

Historical evidence demonstrates that, under the original meaning of the EFC, a sanction may be "excessive" in light of an individual's limited means. In *Timbs*, the Supreme Court emphasized:

> The Excessive Fines Clause traces its venerable lineage back to at least 1215, when Magna Carta guaranteed that "[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement . . . ."

*Id.* at 687. Saving a man's "contenement" meant "to leave him sufficient for the sustenance of himself and those dependent on him."[4] In his 1769 commentaries, William Blackstone emphasized the role of individual considerations in the Magna Carta's prohibition on excessive fines, observing that taxing and moderating should be done "according to the particular circumstances of the offence and offender" and that "[n]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear . . . ." 4 William Blackstone, Commentaries on the Laws of England 372 (1769).

Despite the Magna Carta's protections, "[t]he 17th century Stuart kings . . . us[ed] large fines to raise revenue, harass their political foes, and indefinitely detain those unable to pay." *Timbs*, 139 S. Ct. at 688. Resisting these abuses, British citizens overthrew James II in the

---

[4] Nicholas M. McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause*, 40 Hastings Const. L.Q. 833, 836 (2013).

Glorious Revolution and drafted the 1689 English Bill of Rights, which guaranteed individual rights and reasserted the Magna Carta's protections against excessive fines. *Id*.

English law served as the template for similar guarantees in American state constitutions[5] and later, the EFC. By 1787, when the U.S. Constitution was ratified, "62 percent of the states, comprising 70 percent of the population in 1787, had state constitutions prohibiting the imposition of excessive fines."[6] The language of the English Bill of Rights "was adopted almost verbatim, first in the Virginia Declaration of Rights, then in the Eighth Amendment." *Timbs*, 139 S. Ct. at 688. It was "as an admonition to . . . the national government, to warn them against such violent proceedings, as had taken place in England . . . , when [e]normous fines and amercements were . . . sometimes imposed." *Id.* at 696 (Thomas, J., concurring).

American law thus adopted and carried forward the established English right to be free of excessive fines and fees, measured in part by an individual's financial circumstances. *See, e.g.*, 1787 N.Y. Laws. 344–45 (any "fine or amerciament shall always be according to the quantity of his or her trespass or offence and saving to him or her, his or her contenement"). "[T]he idea of saving defendants from persistent impoverishment was a guiding principle reaching back to the days of the Magna Carta and the English Bill of Rights, and enduring through the ratification of the Eighth Amendment."[7]

In *Bajakajian*, the Supreme Court held unequivocally that the EFC test evaluates the proportionality of an economic sanction in relation to an alleged offense. 524 U.S. at 334. But it

---

[5] The Indiana State Constitution, for example, provides that "[e]xcessive fines shall not be imposed," and "[a]ll penalties shall be proportioned to the nature of the offense." Ind. Const. art. I, § 16.

[6] Steven G. Calabresi et al., *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1517 (2012).

[7] Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 335 (2014).

did not address whether the EFC test also required proportionality in relation to individual financial hardship because the defendant had not raised the issue. *Id.* at 334. However, after invoking the Magna Carta's provision that "amercements (the medieval predecessors of fines) should be proportioned to the offense and that they should not deprive a wrongdoer of his livelihood," the Court observed that the individual had offered no evidence "that full forfeiture would deprive him of his livelihood . . . and the District Court made no factual findings in this respect." *Id*. at 335, 340 n.15. Accordingly, it declined to address this second prong of the proportionality test.

Considering the historical sources that gave rise to the Eighth Amendment, the EFC unquestionably incorporates the twin concepts enshrined in these sources—specifically, that a fine must be proportional to the alleged offense, and that it must preserve an individual's livelihood. The EFC "encod[es] two complementary, but distinct, constitutional principles: (1) a proportionality principle, linking the penalty to the offense, and (2) an additional limiting principle linking the penalty imposed to the allege offender's economic status and circumstances. We might call this second principle the Eight Amendment's 'economic survival' (or perhaps 'livelihood-protection') norm."[8]

    b.   <u>This Court Should Join the Multitude of Courts that Consider Individual Financial Circumstances in the Excessive Fines Analysis.</u>

This Court should join courts across the country in considering individual financial circumstances in the EFC analysis. Following the Supreme Court's decision in *Timbs* and subsequent remand, the Indiana Supreme Court was faced with establishing a new test to consider proportionality and determine whether a forfeiture was excessive. *State v. Timbs* (*Timbs*

---

[8] McLean, *supra* note 4, at 836.

*II*), 134 N.E.3d 12, 36 (Ind. 2019). That court determined that a forfeiture is permissible when: "(1) the property [is] the actual means by which an underlying offense was committed; and (2) the harshness of the forfeiture penalty [is] not . . . grossly disproportional to the gravity of the offense and the claimant's culpability." *Id.* at 27. The Indiana Supreme Court explained that its "proportionality" inquiry is based on the "harshness of the forfeiture's punishment," which expressly includes the "effects the forfeiture will have on the claimant." *Id.* at 36. It looked to "the owner's economic means—relative to the property's value," reasoning that "the historical roots of the [EFC] reveal concern for the economic effects a fine would have on the punished individual." *Id.*

State courts in Colorado, Idaho, Montana, Oregon, Pennsylvania, Tennessee, and North Carolina also consider individual financial circumstances in their EFC analyses. *See Colo. Dep't of Lab. & Emp. v. Dami Hosp., LLC*, 442 P.3d 94, 101–02 (Colo. 2019) ("[A]bility to pay is an appropriate element of the [EFC] grossly disproportionality analysis . . . [because] fine[s] that would bankrupt a person . . . would be a substantially more onerous fine than one that did not."); *State v. Yang*, 452 P.3d 897, 904 (Mont. 2019) (holding that judges must consider "the financial resources of the offender, and the nature of the burden that payment of the fine will impose"); *State v. Goodenow*, 282 P.3d 8, 17 (Or. Ct. App. 2012) ("Whether an otherwise proportional fine is excessive can depend on . . . the financial resources available to a defendant, the other financial obligations of the defendant, and the effect of the fine on the defendant's ability to be self-sufficient."); *Nez Perce Cnty. Prosecuting Att'y v. Reese*, 136 P.3d 364, 379 (Idaho Ct. App. 2006) (holding that courts should consider "the fair market value of the property, the intangible or subjective value of the property, and the hardship to the defendant").

Even before *Timbs*, numerous federal courts in other jurisdictions have incorporated individual financial circumstances into the EFC analysis. In *United States v. Viloski*, the Second Circuit held that courts "may consider—as part of the proportionality determination required by *Bajakajian*—whether the forfeiture would deprive the defendant of his future ability to earn a living." 814 F.3d 104, 111 (2d Cir. 2016). Similarly, the Ninth Circuit recognized that courts should consider "the hardship to the defendant, including the effect of the forfeiture on a defendant's family or financial condition," when assessing a forfeiture's proportionality. *United States v. 6380 Little Canyon Rd.*, 59 F.3d 974, 985 (9th Cir. 1995); *see also United States v. Levesque*, 546 F.3d 78, 83–84 (1st Cir. 2008) ("[T]he notion that a forfeiture should not be so great as to deprive a wrongdoer of his or her livelihood is deeply rooted in the history of the Eighth Amendment."); *United States v. Fogg*, 666 F.3d 13, 18–20 (1st Cir. 2011) (inquiring whether defendant's post-incarceration livelihood would be imperiled by a forfeiture).[9]

Additionally, this Court has recognized that federal courts are well equipped to evaluate individual financial circumstances—including income, tax returns, assets, and expenses—in many legal settings. Courts in this Circuit, for example, routinely consider a litigant's indigence when ruling on a bill of costs submitted by prevailing parties under Federal Rule of Civil Procedure 54(d)(1). *Rivera v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006). Holding that Rule 54(d)'s indigence exemption is well established, the Seventh Circuit explained that district courts may consider documentation of income, assets, and expenses when using its discretion to deny costs. *Id.* at 635–36. In criminal cases, courts frequently evaluate defendants' income, tax returns, and other financial information to determine whether they qualify for appointed counsel.

---

[9] Although the First Circuit recognized that courts should assess the proportionality of an economic sanction in light of individual financial circumstances, it has not yet updated its test following the more detailed historical analysis in *Timbs*.

*United States v. Murphy*, 469 F.3d 1130, 1136 (7th Cir. 2006). Accordingly, federal courts are more than capable of evaluating individual financial circumstances as part of the EFC analysis.

## II.     Attention to an Individual's Limited Financial Means is Necessary to Prevent Abuses of Power and Protect Individual Rights.

As the Supreme Court recognized in *Timbs*, the EFC is needed to guard against abusive fines, fees, and forfeitures. 139 S. Ct. at 689. There has been an unprecedented rise in the use of economic sanctions in Indiana and throughout the country, as governments increasingly rely on fines, fees, and forfeitures to recoup the costs of, and generate revenue for, public programs without imposing taxes.[10] Lawmakers "have even begun writing [monetary sanctions] into projected municipal budgets."[11] In fiscal year 2017, the cities of Boston, New Orleans, New York, and Chicago raised at least $113 per resident from fines and fees, while Washington, D.C. generated $261 per resident.[12] The AAA has characterized the enforcement of traffic, parking, and non-moving violations in the nation's capital as "predatory" and untethered to public safety.[13] In the face of a $1.2 billion budget gap for fiscal year 2021, the City of Chicago will start ticketing drivers caught driving six miles per hour over the speed limit to generate revenue.[14] In 2020, New York City lawmakers incorporated $42 million in revenue from extra

---

[10] Joseph Shapiro, *Supreme Court Ruling Not Enough to Prevent Debtors Prisons*, NPR (May 21, 2014), https://www.npr.org/2014/05/21/313118629/supreme-court-ruling-not-enough-to-prevent-debtors-prisons.

[11] Beth A. Colgan, *Addressing Modern Debtors' Prisons with Graduated Economic Sanctions that Depend on Ability to Pay*, The Hamilton Project 11 (2019), https://www.hamiltonproject.org/assets/files/Colgan_PP_201903014.pdf.

[12] Dan Kopf & Justin Rohrlich, *No US City Fines People Like Washington Fines People*, Quartz (Jan. 29, 2020), https://qz.com/1789851/no-us-city-fines-people-like-washington-dc/.

[13] Tyler Olson*, 'Predatory' DC Government Issues Record $1 Billion in Fines to Drivers*, Fox News (Feb. 21, 2020), https://www.foxnews.com/politics/aaa-calls-dc-parking-and-traffic-enforcement-predatory-as-city-issues-record-1-billion-in-tickets.

[14] Ben Szalinski, *Chicago's Traffic Cameras to Ticket Drivers Going 6 MPH Over Speed Limit*, Ill. Policy (Oct. 29, 2020), https://www.illinoispolicy.org/chicagos-traffic-cameras-to-ticket-drivers-going-6-mph-over-speed-limit/.

parking tickets as part of its plan to revise the police department's budget.[15] Such overreliance of municipalities on traffic and ordinance enforcement to raise revenue has led some to call the practice "taxation by citation."[16]

Absent adequate legal checks, state and local governments' dependence on economic sanctions for revenue generation creates a significant risk of abuse. *Timbs*, 139 S. Ct. at 689. "Perhaps because they are politically easier to impose than generally applicable taxes, state and local governments nationwide increasingly depend heavily on fines and fees as a source of government revenue." *Id.* (quoting Br. for ACLU et al. as Amici Curiae at 7). "[F]ines may be employed as a measure out of accord with the penal goals of retribution and deterrence" because they are a "source of revenue." *Id.* Concern that these economic sanctions could be abused is "scarcely hypothetical." *Id.*

Indeed, examples of such abuses abound. In 2015, the U.S. Department of Justice ("DOJ") examined the use of sanctions for municipal revenue in Ferguson, Missouri, which relied on fines and fees for 13 percent of its general revenue.[17] The DOJ found that the city finance director urged the police chief and city manager to issue more tickets to fill municipal coffers.[18] "The City's emphasis on revenue generation has a profound effect on [the police department's] approach to law enforcement," producing "aggressive enforcement of Ferguson's

---

[15] Shant Shahrigian, *NYC Parking Tickets to Increase as Part of de Blasio Plan to 'Defund' NYPD*, N.Y. Daily News (June 30, 2020), https://www.nydailynews.com/news/politics/ny-parking-tickets-defund-nypd-bill-de-blasio-corey-johnson-20200630-oitbahdqknauhk3jmaltzaxb4q-story.html.

[16] *See* Dick M. Carpenter II et al., *The Price of Taxation by Citation*, Inst. for Just. 5 (Oct. 5, 2019), https://ij.org/wp-content/uploads/2019/10/Taxation-by-Citation-FINAL-USE.pdf.

[17] U.S. Dep't of Just., Civil Rights Div., *Investigation of the Ferguson Police Department* 9 (2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.

[18] *Id.* at 6.

municipal code, with insufficient thought given to whether enforcement strategies promote public safety or unnecessarily undermine community trust and cooperation."[19] As a result, Ferguson's ticketing and collection practices contributed to an "undeniable" lack of trust between residents and government officials.[20] In one notorious example, a Ferguson woman who struggled with homelessness was given a $151 parking ticket that she could not pay in full.[21] Due to Ferguson's revenue-focused practices, she was ultimately jailed for six days and still owed $541, even though she had paid $550 in fines and fees related to efforts to collect the parking ticket over a seven-year period.[22]

Ferguson is not alone in its overreliance on fines and fees based on revenue-generation incentives to impose and collect excessive economic sanctions, regardless of an individual's ability to pay. In 2018, Chicago collected 11 percent of its revenue from fines and fees—the "highest of any of the nation's big cities."[23] A year prior, Chicago raised almost $345 million in fines and fees,[24] issuing over 3.6 million vehicle-related tickets and warnings—54 percent of which were for non-moving violations, such as missing vehicle stickers, expired parking meters, improper license plates, and infractions of street cleaning and residential permit parking rules.[25]

---

[19] *Id.* at 9.

[20] *Id.* at 79.

[21] *Id.* at 4.

[22] *Id*.

[23] Mike Maciag, *Addicted to Fines*, Governing (Sept. 2019), https://www.governing.com/topics/finance/gov-addicted-to-fines.html.

[24] Fran Spielman, *Lightfoot Defends Methodical Approach to Ending City's 'Addiction' to Fines and Fees*, Chi. Sun-Times (July 23, 2019), https://chicago.suntimes.com/city-hall/2019/7/23/20707553/fines-fees-boot-red-light-cameras-city-budget-revenue-lightfoot.

[25] Laura Nolan, *The Debt Spiral: How Chicago's Vehicle Ticketing Practices Unfairly Burden Low-Income and Minority Communities*, Woodstock Inst. 1 (June 2018), https://woodstockinst.org/wp-content/uploads/2018/06/The-Debt-Spiral-How-Chicagos-Vehicle-Ticketing-Practices-Unfairly-Burden-Low-Income-and-Minority-Communities-June-2018.pdf.

To collect these fines and fees, Chicago aggressively impounded vehicles for unpaid tickets and imposed additional fees for towing, impoundment, and storage.[26]

While not every fine, fee, or forfeiture resulting from practices that extract revenue from low-income communities and people of color necessarily violate the EFC, the Clause's protections were intended to shield people from potentially abusive economic sanctions. *See Browning*, 492 U.S. at 267; *see also Timbs*, 139 S. Ct. at 688. Given the financial and political incentives at stake, the EFC provides a necessary check on governmental abuses.

### III. Economic Sanctions Are More Likely to be Impoverishing—and Therefore Excessive—When Imposed on People with Limited Financial Means.

Attention to individual financial circumstances as part of the EFC analysis is consistent with a common-sense interpretation of the term "excessive." For those with limited means, economic sanctions create and exacerbate vicious cycles of debt, unemployment, and poverty—the very harm that the EFC was designed to prevent. *See Timbs*, 139 S. Ct. at 688–89. Failure to consider individual financial circumstances leads to unmanageable sanctions for low-income people, disrupting their ability to support themselves and their families. The impact of economic sanctions is particularly devastating when applied to recipients of means-tested government assistance, such as unemployment insurance and public benefits. Moreover, economic sanctions and their consequences are compounded by, and contribute to, existing inequities for marginalized communities, including Black people and other people of color. Although not every economic sanction necessarily violates the EFC, it is critical that courts consider individual financial circumstances in determining whether fines, fees, or forfeitures are excessive.

---

[26] *See* Elliott Ramos, *Chicago's Towing Program is Broken*, WBEZ (Apr. 1, 2019), http://interactive.wbez.org/brokentowing/.

a.   <u>People with Limited Means Are More Likely to Suffer the Loss of Livelihood and Other Consequences Due to Economic Sanctions.</u>

Imposing economic sanctions that are excessive in relation to an individual's financial circumstances can cause significant hardship for those with limited means. Even before the COVID-19 pandemic sent shock waves through the economy, 40 percent of Americans could not afford a $400 emergency expense.[27] The pandemic has thrown families into even greater financial distress. A September 2020 poll found that 46 percent of people nationwide reported serious financial problems during the pandemic, and that around half of those polled in America's four largest cities—Chicago, Houston, New York, and Los Angeles—reported the same.[28] In Chicago, many households reported that they not only depleted their savings (35%), but also face serious problems paying for housing (25%), utilities (23%), food (17%), and medical care (15%).[29] People who were on a shaky financial footing pre-pandemic are even more vulnerable to financial devastation today.

When faced with sanctions, lower-income individuals are forced to make impossible choices between paying for basic necessities, such as groceries and medicine, and making payments to avoid further harms—severely disrupting their ability to provide for themselves and their families.[30] Desperate to pay off these sanctions, many take out high-interest loans with

---

[27] Bd. of Governors of the Fed. Rsrv. Sys., *Report on the Economic Well-Being of Households in 2018* (May 2019), https://www.federalreserve.gov/publications/2019-economic-well-being-of-us-households-in-2018-dealing-with-unexpected-expenses.htm.

[28] Joe Neel, NPR Poll: *Financial Pain From Coronavirus Pandemic 'Much, Much Worse' Than Expected*, NPR (Sept. 9, 2020), https://www.npr.org/sections/health-shots/2020/09/09/909669760/npr-poll-financial-pain-from-coronavirus-pandemic-much-much-worse-than-expected.

[29] *Id.*

[30] Sarah Stillman, *Get Out of Jail, Inc.*, New Yorker (June 23, 2014), https://www.newyorker.com/magazine/2014/06/23/get-out-of-jail-inc.

extortionate interest rates, burying themselves further under a mountain of debt.[31] It is particularly important to consider individual financial circumstances in the EFC analysis when sanctions are assessed against recipients of unemployment insurance, public benefits, and other means-tested government programs—who, by definition, do not have the financial means to meet basic needs without assistance.

For example, Thomas Barrett, an indigent Georgia resident, was sentenced to pay $200 in fines and fees, serve 12 months of probation, wear an ankle monitor, and pay $360 in monthly monitoring fees, all for stealing a $2 can of beer.[32] Mr. Barrett sold his blood plasma each month, skipped meals, and regularly went without laundry detergent and toilet paper, but still could not meet his monthly payment obligations.[33] Here, the $8,361.25 in punitive economic sanctions on Plaintiff-Appellant plunged her deeper into financial ruin as a person without full-time income who is ineligible for unemployment benefits. Pl.-Appellant's Br. 7–8. This debt cannot be reduced or waived for financial hardship. *Id.* at 2, 5. It accrues interest at .5 percent per month until fully paid and renders Grashoff ineligible for future unemployment benefits. *Id.* at 2. Any tax refund she may receive is subject to an intercept to pay the debt. *Id.* at 5. As of May 2019, Grashoff had paid over $1,515.12 of the punitive economic sanction, but still owed a principal balance of $6,846.13 at the time of filing. Dkt. 33-30. Without full-time income or unemployment benefits to help pay it, Grashoff has turned to public food assistance, borrowed money to buy food and maintain shelter, and been unable to afford medical care, home and car repairs, and other basic costs of living. *Id.* at 7–8.

---

[31] *Id.*
[32] Hum. Rts. Watch, *Profiting from Probation: America's "Offender-Funded" Probation Industry* 34 (2014), https://www.hrw.org/sites/default/files/reports/us0214_ForUpload_0.pdf.
[33] *Id.*

Those who cannot immediately pay economic sanctions often incur additional penalties, driving them further into debt.[34] Minor sanctions may result in massive obligations after accruing interest, costs, and late-payment fees that impede individuals' already-limited ability to pay off their debts.[35] For example, Sandra Botello was unemployed and unable to pay both the fee to renew the Chicago City Vehicle Sticker for her car and the $400 fee to register her son in a private school where he secured a scholarship.[36] She chose to enroll her son in school. But after just 45 days without the sticker, she owed $1,000 from five sticker citations.[37] Although she ultimately purchased a sticker and paid a late fee, she could not afford to pay the fines.[38] With penalties and collection fees, Ms. Botello's debt ballooned to $2,934.[39]

Once locked into debt, low-income individuals often face short-term and long-term consequences that further threaten their ability to support themselves.[40] Failure to pay sanctions may result in the loss of driver's licenses or public benefits, difficulties obtaining housing or employment, inability to pay child support, entanglement in the criminal legal system, and even incarceration.[41] Debt-based driver's license suspensions—which are authorized in Indiana,

---

[34] Chi. Appleseed & Chi. Council of Laws., *Court Costs, Fines, and Fees Are Bad Policy* (July 23, 2020), http://chicagocouncil.org/court-costs-fines-and-fees-are-bad-policy/.

[35] Alexis Harris et al., *Monetary Sanctions in the Criminal Justice System* 4 (Apr. 2017), http://www.monetarysanctions.org/wp-content/uploads/2017/04/Monetary-Sanctions-Legal-Review-Final.pdf.

[36] Elliott Ramos, *Chicago Seized and Sold Nearly 50,000 Cars Over Tickets Since 2011, Sticking Owners With Debt*, WBEZ (Jan. 7, 2019), https://www.wbez.org/shows/wbez-news/chicago-seizes-and-sells-cars-over-tickets-sticking-drivers-with-debt/1d73d0c1-0ed2-4939-a5b2-1431c4cbf1dd.

[37] *Id*.

[38] *Id*.

[39] *Id*.

[40] *See* Karin D. Martin et al., *Shackled to Debt: Criminal Justice Financial Obligations and the Barriers to Re-Entry They Create* (Jan. 2017), https://www.hks.harvard.edu/sites/default/files/centers/wiener/programs/pcj/files/shackled_to_debt.pdf.

[41] *Id.*

Illinois, and Wisconsin—often lead to further hardship, job loss, and missed job opportunities, particularly for those who lack access to reliable public transportation.[42] Economic sanctions inflict harm against the entire household and jeopardize the physical and emotional well-being of children.[43]

McArthur Edwards, an indigent Wisconsin resident with four children, lost his driver's license for two years after he was unable to pay a $64 traffic ticket for driving with a broken light over his license plate.[44] Out of necessity, Edwards continued to drive and accrued six additional tickets—most for driving with a suspended license—resulting in $1,800 in fines.[45] The suspension of his driver's license prevented Edwards from providing for his children and limited his job opportunities.[46]

The devastating impact of monetary sanctions has been particularly visible in the wake of the COVID-19 pandemic. Earlier this year, thousands of newly laid-off workers in Illinois were forced to wait weeks and, in some cases, months to receive critical unemployment benefits due to a state policy imposing penalties when accounts were flagged for fraud.[47] In many cases, applicants were unaware of the fraud allegations and found themselves struggling to make ends

---

[42] *See* Mario Salas & Angela Ciolfi, *Driven By Dollars*: *A State-by-State Analysis of Driver's License Suspension Laws for Failure to Pay Court Debt* (2017), https://www.justice4all.org/wp-content/uploads/2017/09/Driven-by-Dollars.pdf.

[43] Alex Bender et al., *Not Just a Ferguson Problem: How Traffic Courts Drive Inequality in California* 21 (2016), https://lccrsf.org/wp-content/uploads/Not-Just-a-Ferguson-Problem-How-Traffic-Courts-Drive-Inequality-in-California-4.8.15.pdf.

[44] Joseph Shapiro, *How Driver's License Suspensions Unfairly Target the Poor*, NPR (Jan. 5, 2015), https://www.npr.org/2015/01/05/372691918/how-drivers-license-suspensions-unfairly-target-the-poor.

[45] *Id.*

[46] *Id.*

[47] Dana Kozlov, *18,165 People in Illinois Are Stuck Waiting Out Penalty Weeks Before Getting Unemployment Benefits*, CBS Chi. (Apr. 20, 2020), https://chicago.cbslocal.com/2020/04/20/18165-people-in-illinois-are-stuck-waiting-out-penalty-weeks-before-getting-unemployment-benefits/.

meet during a global pandemic.[48] As the COVID-19 pandemic continues to inflict economic harms, it is especially critical that courts consider individual financial circumstances in determining whether a monetary sanction is permissible under the EFC. The failure to do so "would generate a new fiction: that taking away the same piece of property from a billionaire and from someone who owns nothing else punishes each person equally." *Timbs II*, 134 N.E.3d at 36.

      b.   <u>Economic Sanctions Perpetuate and Reproduce Conditions of Poverty for Marginalized Communities, Including People of Color.</u>

The explosive growth of economic sanctions fueled by revenue-generation incentives, which include excessive fines, fees, and forfeitures, disproportionately harms low-income people and people of color.[49] Eight of ten Chicago zip codes with the most ticket debt per adult are majority Black.[50] In addition, even though Black residents make up only 40 percent of the population of Milwaukee, Wisconsin, 73 percent of municipal court cases in which an individual owed money to the court involved Black defendants.[51] Indeed, municipalities that rely heavily on economic sanctions for revenue have comparatively larger Black populations.[52]

The imposition of unmanageable sanctions often compounds existing inequities, including the racial wealth gap, higher poverty and unemployment rates, and discrimination in

---

[48] *Id.*

[49] Chi. Appleseed & Chi. Comm. of Laws., *supra* note 34, at 2.

[50] Melissa Sanchez & Sandhya Kambhampati, *How Chicago Ticket Debt Sends Black Motorists Into Bankruptcy*, ProPublica Ill. (Feb. 27, 2018), https://features.propublica.org/driven-into-debt/chicago-ticket-debt-bankruptcy/.

[51] Edgar Mendez, *Blacks Slammed by Municipal Court Fines*, Urban Milwaukee (Nov. 4, 2016), https://urbanmilwaukee.com/2016/11/04/blacks-slammed-by-municipal-court-fines/.

[52] Dan Kopf, *The Overlooked Reason Why Some Cities Have Strained Relationships With Cops*, Bus. Insider (July 11, 2016), https://www.businessinsider.com/reason-for-strained-relationship-with-police-2016-7; *see also* Chi. Appleseed & Chi. Comm. of Laws., *supra* note 34, at 10 (noting that many jurisdictions "use monetary sanctions to raise revenue from predominantly Black and Brown communities").

access to public benefits, employment, and housing.[53] Black people, in particular, are more likely to face employment discrimination and perceptions of criminality, live in communities with fewer stable employment opportunities, and be targeted by police.[54] While some economic sanctions may not violate the EFC, the failure to consider the proportionality of an economic sanction in relation to individual financial circumstances would undermine the EFC's foundational purpose to guard against the deprivation of one's livelihood, leaving communities of color especially vulnerable to financial ruin from excessive fines, fees, and forfeitures.

---

[53] Rakesh Kochhar & Richard Fry, *Wealth Inequality Has Widened Along Racial, Ethnic Lines Since End of Great Recession*, Pew Research Ctr. (Dec. 12, 2014), https://www.pewresearch.org/fact-tank/2014/12/12/racial-wealth-gaps-great-recession/.
[54] U.S. Comm'n on Civil Rights, *Targeted Fines and Fees Against Communities of Color* 3 (Sept. 2017), https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2017.pdf.

## <u>CONCLUSION</u>

An EFC jurisprudence rooted, as is necessary, in the history of the Eighth Amendment must be attentive to differences in how fines, fees, and forfeitures impact individuals. *Amici* urge the Court to make clear that the impact of the penalty on the individual is an essential element of evaluating the proportionality of an economic sanction. For the reasons stated above, *amici* respectfully request that this Court reverse the district court's order.

Respectfully submitted,

Nusrat J. Choudhury
ROGER BALDWIN FOUNDATION
  OF ACLU, INC.
150 N. Michigan Ave.
Suite 600
Chicago, IL 60601
(312) 201-9740

/s/ Linda S. Morris
Linda S. Morris
Claudia Wilner
NATIONAL CENTER FOR LAW
  AND ECONOMIC JUSTICE
275 Seventh Avenue, #1506
New York, NY 10001
(212) 633-6967
morris@nclej.org

R. Orion Danjuma
Amreeta S. Mathai
Olga Akselrod
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Lisa Foster
FINES AND FEES JUSTICE CENTER
185 West Broadway
Suite C-538
New York, NY 10013
(212) 431-2100

Jeremy Rosen
SHRIVER CENTER ON POVERTY LAW
67 E. Madison Street
Suite 2000
Chicago, IL 60603
(312) 854-3381

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and

Fed. R. App. P. 29(d). This brief contains 6,104 words, excluding the parts of the brief exempted

by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-counting function in Microsoft

Office 2010. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and

the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a

proportionately-spaced typeface using Microsoft Word in 12-point Times New Roman, with 12-

point Times New Roman footnotes.


Dated:  November 25, 2020                           /s/ Linda S. Morris
                                                    Linda S. Morris

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2020, this brief was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit through the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  November 25, 2020                                    /s/ Linda S. Morris_____
                                                            Linda S. Morris